DOCKETED
JUN 17 [?]
FILED
JUN 14 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 01 CR 469 |
| ) | Judge Susan Conlon |
| ANDREW CUBRIA, ) | |
| Defendant. ) | |

### DEFENDANT ANDREW CUBRIA'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE

Defendant, ANDREW CUBRIA, by the FEDERAL DEFENDER PROGRAM and its attorneys IMANI CHIPHE and HELEN J. KIM, respectfully submits the following corrections to the guideline calculations and interpretations, and moves this Honorable Court pursuant to 18 U.S.C. § 3553 and U.S.S.G. § 5K2.0, for a downward departure from the applicable guideline range due to extraordinary family circumstances. In support of this motion, Dr. Cubria states the following:

### I. INTRODUCTION

Dr. Andrew Cubria is a fifty-one year old Cuban-American. He was born in Havana, Cuba on September 7, 1950, to Maria and Francisco Enrique Cubria. Dr. Cubria's life as a child in Cuba was difficult. He suffered constant physical abuse from his father, who beat him with a belt, burned him with a lighter and threw things at him. Dr. Cubria immigrated to the United

1



States in 1960. He came to the United States as part of Operation Peter Pan, a relocation of over 14,000 Cuban children to the United States. All of the children were sent without their parents. Dr. Cubria remembers this as a particularly unhappy time in his life. He felt out of place in the United States, he did not speak English at the time, he was living with strangers, and did not have contact with his family. Dr. Cubria's mother and father joined him in the United States approximately six months later. In 1962, the family relocated to Chicago, where his father had friends and employment opportunities. Unfortunately, the physical abuse continued. The physical and emotional abuse resulted in an unpleasant home environment. However, notwithstanding the turmoil that existed between Dr. Cubria and his father, he enjoyed a loving and close relationship with his mother and sister. His mother was the primary care giver during Dr. Cubria's childhood. She was the parent who encouraged and supported him and his sister. Mrs. Cubria always gave Dr.Cubria and his sister unconditional love.[1] Mrs. Cubria is now 74 years old. Dr. Cubria and his sister share the responsibility of caring for their mother.

On October 4, 1992 Dr. Cubria married Katherine Cubria. Their marriage was difficult and in 1997 they filed for divorce. One child was born to their union, Blake Cubria. Blake is now eight years old. During the divorce both Katherine and Dr. Cubria sought sole custody of Blake. However, Dr. Cubria was awarded sole custody of Blake in December of 1998. Cook County Domestic Relations Judge Anthony J. Coleman found that Katherine Cubria's mental health and judgement were in question due to several of her actions that were not in the best interest of Blake. See Exhibit A, Order of Cook County Judge Anthony J. Coleman. Since Dr.

---

[1] Andrew's sister Maria Greshman is 55 years old and is dying from pancreatic cancer. She resides with her husband.

Cubria has been charged in this case, and due to the uncertainty that this case has brought in their lives, he has allowed Blake to go live with Katherine. He now sees Blake, who he has been the sole and primary care giver for, infrequently. Blake misses the love, support and emotional guidance that Dr. Cubria gave him.

Dr. Cubria's pride and joy are his children, Melissa, the oldest is nineteen years old and is a freshman at the University of San Francisco; Andrew Jr., is seventeen and just graduated from high school; and Blake, who Dr. Cubria has raised alone for the last few years. He is especially close to his children and offers them unconditional love and honesty. Dr. Cubria has had sole custody and has raised his children for most of their lives, often in difficult circumstances. They love their father very much and are heartbroken by his impending imprisonment. See Exhibit B, Melissa Cubria's letter.[2]

On October 4, 2001 Mr. Cubria was indicted for violations of 18 U.S.C. §§ 2, 1341, 1343, 1347, 1962, and 42 U.S.C. § 1320a-7b. However, months before being indicted, Dr. Cubria was contacted by the government and notified that he was under investigation for participating in Medicaid fraud. Soon thereafter, he began cooperating with the government, giving detailed statements about his activities as well as the activities of those with whom he worked. He provided background information to the authorities about Edgewater Hospital and about certain individuals. Dr. Cubria has given a substantial amount of information to the government, outlining his conduct and conduct of numerous other people. He has agreed to testify at trial, and he has testified before the grand jury. Dr. Cubria agreed to tape record his

---

[2] Dr. Cubria is a well respected member of the community. His family and friends respect and love him, and continue to do so during these difficult times for him. This is evidenced by the numerous letters forwarded to the Court's attention by Ms. Hendrickson.

3

conversations with certain individuals and did, in fact tape record an individual who provides patients to Edgewater Hospital. Dr. Cubria continues to cooperate with the government, and pursuant to his plea agreement will testify at trial if necessary.

Dr. Cubria does not have a criminal history. He regrets committing the instant offense and, acknowledges and accepts responsibility for his actions. Dr. Cubria realizes that his actions have hurt and shamed his family, friends, patients and society at large, and for that, he is deeply sorry. He looks forward to putting this chapter of his life behind him and beginning his life anew. Dr. Cubria only hopes and prays that he has the opportunity to emerge from imprisonment with the chance to participate in and resume the raising and guidance of his children – especially, his young son Blake.

## II. CORRECTIONS TO THE GUIDELINE CALCULATIONS AND INTERPRETATIONS

Paragraph seven of the plea agreement in this case allow for "Errors in calculations or interpretations of any of the guidelines may be corrected by either party prior to sentencing." Pursuant to paragraph seven Dr. Cubria makes the following corrections to the guideline calculations and interpretations:

### A. Mass-Marketing Enhancement

In the plea agreement (hereinafter referred to as "Plea") between the United States and the defendant, Andrew Cubria, the government indicates that the applicable Guidelines Section for the charge of fraud is §2F1.1. Using the 2000 Sentencing Guidelines Manual, the government

4

states that the base level is $6^3$. Plea at 12. In paragraph 6(e), the government indicates that the base level should be increased by 2 levels because the offense was committed through mass-marketing. Plea at 13.

Specifically, under 2F1.1(b)(3), the guidelines state if the offense was committed through mass-marketing, increase by 2 levels. The application notes then define "mass marketing" as "a plan, program, promotion or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (A) purchase goods or services; (B) participate in a contest or sweepstakes; or (C) invest for financial profit. The enhancement would apply, for example, if the defendant conducted or participated in a telemarketing campaign that solicited a large number of individuals to purchase fraudulent life insurance policies." U.S.S.G. §2F1.1.

Here, the government argues in their version (hereinafter referred to as "U.S. Version") that Dr. Cubria's offense conduct involved television advertisements that were geared towards inducing large numbers of individuals to purchase services from Dr. Cubria and the hospital. U.S. Version at 12. They state that the hospital paid approximately $40,000 a month for television ads, Dr. Cubria appeared in some of the ads, and this solicitation resulted in defrauding of Medicare, Medicaid and private insurers. Id. Although unable to provide any evidence for why the hospital's general advertising should be attributed to Dr. Cubria's offense conduct, the government cites the cases of United States v. Coe, 220 F3d 573, 577 (7th Cir. 2000) and United

---

[3] The guideline calculations found in the PSR were made according to the 2000 edition of the Guidelines Manual. In this case, the defendant believes that use of the amended 2001 edition would in fact violate the ex post facto cause. Therefore, he is in agreement with the 2000 manual being used to determine his sentence.

5

States v. Pirello, 255 F.3d 728, 731-2 (9th Cir. 2001), and seems to generally propose that use of television advertisements can reach a large audience and that alone constitutes reason for the mass-marketing enhancement. U.S. Version at 12. They misplace their reliance on Pirello and Coe, however, because they fail to specifically show any evidence as to how the advertisements perpetuated the fraud.

It has been recognized that there is not much case law available to provide guidance on proper utilization for the mass-marketing enhancement. United States v. Sarno, 2002 WL 1047012 (4th Cir. N.C. 2002). Nevertheless, it has been firmly established that the number of people actually defrauded by a scheme or plan is not controlling; rather, the attempt to induce a large number is key. Id.; see also Pirello, 255 F.3d 728 at 732. Here, the government has not established any link between the advertisements and the intended or actual victims in this case. Moreover, most cases in this area contain facts where the defendant had no intention to deliver the particular service or solicited item in the first place. See e.g., United States v. Blanchett, 2002 WL 511745 (CA 10 (Kan) 2002) (defendant placed advertisements on ebay for computer equipment he never intended to send); United States v. Sarno, 2002 WL 1047012 (CA 4 2002) (defendant held himself out to be sole proprietor of investment firm, got victims to invest money and victims were mailed statements showing alleged gains on fake investment.) Even in Coe, one of two main cases pointed out by the government, the facts are distinguishable from this one because those defendants used a marketing ploy to perpetuate a fraud lacking any evidence of legitimacy. Coe, 220 F3d 573 at 576. Specifically, in that case, three co-defendants contacted over 65 people during the course of three years through the mail and by phone. Id. All over the age of 55, the victims were told that they had won various prizes that could be claimed after

6

sending in money for taxes and fees. Id. at 579. The defendants contacted some of the victims more than one time and they continued to represent that prizes were coming when in fact there were none in existence. Id. Similarly, in Pirello, the defendant used the internet and posted ads on a website advertising the sale of a computer that he never intended to provide in the first place. Pirello, 255 F.3d 728 at 732.

In summary, although the plea agreement indicates that all parties agreed to the enhancement for mass-marketing, it does appear that the interpretation that the guideline enhancement was warranted is incorrect. Most important is the fact that both the hospital and Dr. Cubria provided numerous individuals with legitimate medical services despite their fraudulent activities, and thus, it cannot be established that the advertisements were attributable to Dr. Cubria without showing more. Rather, the facts of this case indicate that the television ads were done for legitimate business purposes and therefore do not meet the criteria for the enhancement. His mere presence in the advertisements alone, without some showing of criminal intent, is simply insufficient and the court should find that the enhancement does not apply on this basis.

### B.     Vulnerable Victims

The plea agreement indicates in paragraph 6(i) that the base level should be increased by 2 levels pursuant to Guideline §3A1.1(b)(1) because the defendant knew or should have known that a victim of the offense was a vulnerable victim. Plea at 13. In the government's version, they argue, "many of the patients were elderly, some were handicapped. Some were low income.... Elderly, low income, and in some instances handicapped individuals who were ill constitute[] vulnerable victims." U.S. Version at 15. The plea further provides for an additional 2 levels because there were a large number of vulnerable victims pursuant to §3A1.1(b)(2). Plea

7

at 13. In support of these added 2 levels, the government simply states again that of the many patients, "some were handicapped, and some were confused and disoriented, and therefore unable to give consent." U.S. Version at 16.

Guideline §3A1.1 is a Chapter Three Adjustment that may be applied to a variety of cases. U.S.S.G. §3A.1.1. It specifically states in its application notes that a "vulnerable victim" is a person who is either a victim of the offense and unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Id. It provides examples of a defendant who markets an ineffective cancer cure or someone who robs a handicapped person. Id. It does not apply, by contrast, to those who happen to be old or senile in a situation where a mailing is to the general public but a victim happens to be old or senile. Id.

First, it is well established in this circuit that in order to support this enhancement, the court must find both that the victims were *unusually* vulnerable in some way, and that the defendant targeted them for this reason. United States v. Jackson, 95 F.3d 500, 507 (7th Cir. 1996); United States v. Sutherland, 955 F.2d 25, 27 (7th Cir. 1991) (citing to United States v. Paige, 923 F.2d 112 (8th Cir. 1991).) "Unusually vulnerable" is heightened threshold of proof with the emphasis on unusual. United States v. Robinson, 152 F.3d 507, 510 (6th Cir. 1998.) This is because it is "logical to assume that the intended victim of any premeditated offense will be selected because something in his or her persona or circumstances will make successful the intended criminal act." United States v. Creech, 913 F.2d 780, 782 (10th Cir. 1990). Therefore, the Commission adopted §3A1.1 to enhance the punishment for particular depravity shown by the defendant. Id.

8

While it may appear at first blush that the government's assertions that the victims were vulnerable would be logically supported by the case law in this area, a broad and unsupported generalization, as done by the government, cannot support the upward adjustment. See United States v. Sutherland, 955 F.2d 25 at 27. While each and every victim does not have to be found unusually vulnerable for the enhancement to apply, i.e. just some of the victims is sufficient, the finding must specifically focus on the victim and not a general class. United States v. Jackson, 95 F.3d 500 at 508; see also United States v. Creech, 913 F.2d 780 at 782 (case remanded due to finding that general class of "newlyweds" are not necessarily more vulnerable than others without specific showing as to why); United States v. Sutherland, 955 F.2d 25 at 27 (case remanded because there was no evidence that age was actually considered by the defendant despite the lower court's finding that "war veterans" were vulnerable.) Even the labels and categories specifically used by the government, namely "elderly," "low income" or "handicapped," have been struck down as insufficient grounds for the enhancement without a particularized showing as to the victims. See United States v. Parillo, 1992 U.S. App. LEXIS 18515 (6th Cir. 1992); United States v. Smith, 39 F.3d 119, 124 (6th Cir. 1994); United States v. Lee, 973 F.2d 832, 834-5 (10th Cir. 1992).

In conclusion, many courts have cited to facts where the defendants purposefully "reloaded" on the victims, or used a "reloading process," where they went back more than once time to the victim because they knew that the victim was particularly susceptible to the request or solicitation based on their acquiesce to the first request or scheme. See e.g. United States v. Robinson, 152 F.3d 507 at 511; United States v. Jackson, 95 F.3d 500 at 508; United States v. O'Neil, 118 F.3d 65, 75 ((2nd Cir. 1997). Here, there is no evidence of reloading used by the

9

defendant. Nor is there evidence presented at all that age or physical status was used in deciding upon them as victims. Broad classifications, as used here, are clearly erroneous without specific showing of the victims' actual vulnerability. Without details as to how the victims here were unusually vulnerable and that Dr. Cubria knew that the victims were vulnerable and targeted them for that reason, the court should not impose the enhancement.

### C. Violation of Administrative Order/Judicial Process

The plea agreement leaves open the question of whether a 2 level enhancement is warranted pursuant to §2F1.1(b)(4)(C) for a violation of judicial process or administrative order, decree or process.[4] Plea at 13. Specifically, §2F1.1(b)(4)(C) provides, "If the offense involved... (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not elsewhere in the guidelines, increase by 2 levels...." U.S.S.G. §2F1.1. The corresponding application notes specifically state that this subsection applies to those defendants who have received a prior official judicial or administrative warning-- in the form of an order, injunction, decree, or process--yet they directly contravene that warning. Id. It appears that the blatant disregard by a defendant of such order is what the Sentencing Commission had in mind when it stated that this disregard would demonstrate aggravated criminal intent by the defendant and would justify additional punishment.

Here, there was no prior official judicial or administrative order, decree, injunction, or process. The government argues that §2F1.1(4)(C) applies because Dr. Cubria violated an

---

[4] It should be noted that the government mistakenly states that the governing Guideline section is §2F1.1(b)(4)(B), but this section involves "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." Rather, subsection (C) provides for violation of any prior, specific judicial or administrative order, injunction, decree or process... and should be the section cited.

10

*informal* administrative decree. U.S. Version at 13. They specifically argue that Edgewater Hospital entered into Settlement and Corporate Integrity Agreement with the Department of Justice, Department of Health and Human Services, Department of Public Aid and the State of Illinois in November 1999, and this agreement broadly provided that Edgewater Hospital would comply with all federal laws, regulations, health care programs and would have its employees or contractors abide by the compliance program agreement. Id. at 14-15. The government believes that it was "widely known" that the hospital had entered this agreement, and therefore, sufficient notification of punishment existed to the employees and Dr. Cubria. Additionally, in a supplemental version sent to U.S. Probation on March 19, 2002 (hereinafter referred to as U.S. Version 2), the government argues that Dr. Cubria signed a document on February 1, 2000, stating that he would comply with the law and this should be viewed by the court as part of the Settlement Agreement. U.S. Version 2 at 2. The government gives no basis for why the court should view these two together or link the February 2000 certification with the Settlement Agreement signed in 1999 by the hospital.

In discussing an entity controlled by a defendant, the Guideline application note states that if the defendant was a party to the prior proceeding that resulted in the judicial or administrative action, and the defendant had knowledge of that prior decree or order, then the enhancement applies even if the defendant was not a specifically named party in the prior case. An example given is a defendant whose business is enjoined from selling a product but he continues to do so despite the injunction. Id. Here, it is highly questionable as to whether a settlement agreement constitutes a "proceeding" at all. Furthermore, even if it were, Dr. Cubria

11

was not a party to that prior proceeding. Nor did he ever exert "control" over the hospital in any way, in 1999 through the present.

The government cites to United States v. Mantas, 274 F3d 1127, 1131-3 (7th Cir. 2001), for the proposition that an informal administrative process that results in an informal decree is sufficient for this enhancement to apply. U.S. Version at 13. They argue that Dr. Cubria, "by signing document agreeing to perform duties in compliance with law and with highest ethical and moral standards and failing to do so, showed aggravated criminal intent." The government's reliance on Mantas is faulty because the facts of that case are clearly distinguishable from the facts here. In that case, a red tag was placed on meat/poultry cooler by the USDA–in front of Mantas--during an inspection of the premises. Mantas, 274 F3d 1127 at 1129. The defendant in that case continued to sell from the cooler even though the tag was on it and while the inspectors were continuing with their inspection on the second floor. Id. The court found the enhancement warranted because, although acknowledging that it was a liberal interpretation of what would trigger enhancement, the tag was enough of an informal decree notifying the defendant that continued selling would violate state law. Id at 1132. There, the court found that the defendant's blatant disregard of the USDA tag was evidence of aggravated criminal intent. Furthermore, although the tag was not personally directed at the defendant, the court found adequate reason for the enhancement to apply to the defendant and the appellate court affirmed the decision. Id. at 1133. Here, Dr. Cubria's aggravated criminal intent is absent.

Finally, in the case of United States v. Linville, 10 F.3d 630 (C.A.9 1993), the Oregon appellate court found that warnings in the form of a letter from the USDA to the defendant (stating that selling dogs and cats to dealers without a license may subject her to prosecution) is

more analogous to the situation here. Although not binding on this court, the logic of that court is sound in that they found the warnings–neither the result of an adversary proceeding or a formal order–insufficient to be deemed "administrative process" despite the finding of the lower court. Id. "It is pellucid that there is a vast difference between ignoring prior decrees, orders and injunctions after being subjected to formal proceedings, and ignoring letters and the like, no matter how official they might look. To hold otherwise would compel enhancements in every criminal case where a defendant knew or was told by someone in authority that what she was doing was illegal, rather than limiting them to more relatively unusual cases where someone violated a specific court or agency order or adjudication." Id. Here, Dr. Cubria's signature on a general certification form which apparently was signed by all employees stating that he has attended a Business Ethics training session does not amount to an informal order even in the light most favorable to the government. Likewise, his signature on February 1, 2000, indicating that he had read Edgewater's Code of Conduct and agreed to follow the policies and perform duties in compliance would not amount to "administrative process" or an order or decree.

In conclusion, the actual Settlement Agreement was not signed by Dr. Cubria, but was rather an agreement entered into by various governmental agencies and Northside Operating Company--signed solely by the Chief Executive Officer, Joanne Skvarek of Northside on November 3, 1999, and her counsel. The enhancement is unwarranted here and the fact of this case make it unfair to add 2 levels on this basis. Therefore, the enhancement should not apply on this grounds in order to more accurately reflect the goals of the Sentencing Commission.

## III. DEPARTURE

As the United States Supreme Court has found, District Courts retain discretion in sentencing defendants under the Guidelines, "[a]cknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances," Koon v. United States, 518 U.S. 81(1996) (*citing* 28 U.S.C. § 991(b)(1)(B)), and pointing out that departures from the applicable guideline sentence are permitted when circumstances exist that are of a kind or degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. See 18 U.S.C. §3553(b) (1995 ed.); United States Sentencing Guidelines, § 5K2.0. Congress has mandated that the court consider the "history and characteristics of the defendant" in deciding what sentence is appropriate, 18 U.S.C. §3553(a)(1), and has required that the sentence shall be **"sufficient, but not greater than necessary"** to provide just punishment, afford adequate deterrence, protect the public from future crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. 3553(a)(2). In order to fulfill these obligations, Congress has also recognized that there may be aggravating, or as in this case, mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the guidelines. 18 U.S.C. 3553(b). The need for such departures is acknowledged and embodied in the guidelines. See §5K2.0 et seq. In considering what will be a sufficient, but not greater than necessary sentence in this case, Mr. Cubria respectfully requests the Court to consider his extraordinary family circumstances, and other mitigating factors as bases for departing from the guideline requirement in this case.

## A. Extraordinary Family Circumstances

Under U.S.S.G. §5H1.6, family ties are not ordinarily relevant in determining whether a sentence should be outside the guidelines." The Supreme Court, in Koon, characterized this guideline section as a "discouraged factor" that is not "necessarily inappropriate" for departure, but should be relied upon "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon v. United States, 518 U.S. 81. Even prior to the Supreme Court's findings, most circuits (including the Seventh Circuit) have held that, in cases that are apart from the usual, departures based on family circumstances are acceptable. See, United States v. Owens, 145 F.3d 923 (7th Cir. 1998) (affirming downward departure from level 32 (169 to 210 months) to 120 months under §5H1.6 for defendant convicted of possession of crack cocaine with intent to distribute where "he maintained a good relationship with his three children"); see also, United States v. Canoy, 38 F.3d 893 (7th Cir. 1994).

The critical issue is what distinguishes the ordinary from the unusual. See United States v. Aguirre, 214 F.3d 1122 (9th Cir. 2000) (departing downward 4 levels for extraordinary family circumstances "based on the fact that there is an 8 year-old son who has already lost a father and would be losing a mother for a substantial period of time"); United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992) (departure granted where single mother responsible for three young children, including infant and child of institutionalized daughter); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (defendant and wife had two young daughters and cared for the defendant's disabled father and paternal grandmother); United States v. Gaskill, 991 F.2d 82, 85

(3d Cir. 1993) (defendant is sole caretaker of mentally ill wife, he posed no threat to the community, and sentence was brief).

In United States v. Canoy, 38 F.3d 893, the court relied on the case law of other circuits to show when "the period on incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to family and parental relationships that would be present in the usual case." Canoy at 907. Canoy's departure was granted by the District Court in the first instance because Canoy was a "good father, he has three exemplary children who all are 'straight-A' students, and because the District Court believed that the family unit would suffer 'substantially' and perhaps 'irreparably' if Canoy were incarcerated for 27 months." Id. See also United States v. Moy, 1995 LEXIS 6732 (N.D. Ill. May 15, 1995) (care for terminally ill wife and unavailability of other relative to help constitute extraordinary family circumstances).

In this case, like the defendants in Canoy and Owens, Mr. Cubria's custody of his eight year old son Blake and the relationship that he enjoys with his children and the fact that he has been their primary care giver is extraordinary. In addition, Dr. Cubria's ex-wife will have custody of Blake, despite the fact that she has already been deemed unfit and not to have Blake's best interest at heart. See, Exh. B. She will be responsible for raising him and his upbringing. These factors and circumstances are extraordinary and apart from the usual, thus making Dr. Cubria eligible for a downward departure based on his family circumstances.

## IV. CONCLUSION

The United States Supreme Court, while recognizing the uniformity and predictability provided by the Guidelines, has found that:

[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge. Koon v. United States, 518 U.S. at 113.

Dr. Cubria requests that this Court grant him a downward departure based on his extraordinary family circumstances.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By: _____
Imani Chiphe

By: _____
Helen J. Kim

Attorneys for Defendant
Andrew Cubria

IMANI CHIPHE
HELEN J. KIM
FEDERAL DEFENDER PROGRAM
55 E. MONROE STREET, SUITE 2800
CHICAGO, ILLINOIS 60603
(312) 621-8300

SEE CASE FILE FOR EXHIBITS