UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED-ED4

12 JUN 25 AM 10:41

CLERK
U.S. DISTRICT COURT

| UNITED STATES OF AMERICA | ) | |
| | ) | No. 01 CR 469 |
| v. | ) | Judge Suzanne B. Conlon |
| | ) | |
| DR. ANDREW CUBRIA | ) | |

### NOTICE OF FILING

TO:     Kelly Hendrickson          Imani Chiphe
        U.S. Probation             Federal Defender
        55 E. Monroe               55 E. Monroe
        Chicago, IL 60603          Chicago, IL 60603

PLEASE TAKE NOTICE that on Tuesday, June 25, 2002, the undersigned filed with the Clerk of this Court the following document in the above captioned case: **GOVERNMENT'S MOTION TO FILE A RESPONSE TO DEFENDANTS' SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE, IN EXCESS OF 15 PAGES, and GOVERNMENT'S RESPONSE TO DEFENDANT CUBRIA'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE** service of which is being made upon you.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     _Jacqueline Stern/mg_
        JACQUELINE STERN
        Assistant United States Attorney
        219 S. Dearborn, 5th Floor
        Chicago, IL 60604

| STATE OF ILLINOIS | ) | |
| | ) | SS |
| COUNTY OF COOK | ) | |

Mia F. McDowell, being first duly sworn on oath deposes and says that she is employed in the Office of the United States Attorney for the Northern District of Illinois; that on the 25th day of June, 2002, she caused the foregoing Notice of the above-mentioned **Motion** to be sent via hand delivery addressed to the individual(s) listed above on said date.

_Mia F. McDowell_

SUBSCRIBED AND SWORN TO BEFORE ME
this 25th day of June, 2002.

_Peggy M. Zabinski_
NOTARY PUBLIC

"OFFICIAL SEAL"
Peggy M. Zabinski
Notary Public, State of Illinois
My Commission Exp. 06/04/2006

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
v. )  No. 01 CR 469
)  Judge Suzanne B. Conlon
ANDREW CUBRIA )

**GOVERNMENT'S MOTION TO FILE A RESPONSE TO DEFENDANTS'
SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE,
IN EXCESS OF 15 PAGES**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United
States Attorney for the Northern District of Illinois, respectfully
moves this Court to allow the government to file a Response to the
Defendants' Motion, which response is in excess of 15 pages.

1.   The defendant in this case has pled guilty to one count
of Racketeering.   The indictment alleges that the scheme lasted
from approximately the early 1990s through at least December 2000.

2.   The accompanying Response addresses the issues raised by
the Defendants' Sentencing Memorandum.   The government believes
that this will help the Court resolve the issues.

3.   Three of the issues addressed by the government pertain to
Guidelines issues that the defendant had stipulated to as part of
the plea agreement, but which he now challenges.

## CONCLUSION

The government respectfully requests that the Court enter an order allowing the government to file a Response to the Defendant's Sentencing Memorandum and Motion for a Downward Departure.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
JACQUELINE STERN
Assistant U.S. Attorney
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 353-5329


By: _____
KAARINA SALOVAARA
Assistant U.S. Attorney
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 353-8880

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

JUN 2 5 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 01 CR 469 |
| | ) | Judge Suzanne B. Conlon |
| ANDREW CUBRIA | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT CUBRIA'S
### SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully moves this Court to reject defendant Andrew Cubria's arguments concerning the mass marketing and vulnerable victims enhancements, and to deny the motion for a downward departure for the reasons set forth below.

### Mass Marketing

The Sentencing Guidelines provide for a two level enhancement if the offense was committed through mass-marketing. § 2F1.1(b)(3). The Commentary defines mass-marketing as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (A) purchase goods or services". § 2F1.1, Commentary ¶ 3.

Although the defendant stipulated in the plea agreement that this enhancement is applicable, he now argues that it should not be applied. The defendant's argument should be rejected.

The charged scheme involved mass marketing through the use of

1

television advertisements. Using these ads, allowed the defendants to reach a large number of patients, who could be used as part of the scheme.

In the plea agreement, the defendant admitted that the television advertising was an integral part of the fraud scheme, used to generate patients for the defendant and the hospital. Specifically, the defendant admitted that:

> Edgewater paid approximately $500,000 a year, for at least 3 years, for television advertising that generated patients for Cubria's private medical practice. Edgewater paid for this advertising in order to maintain and/or increase the number of patients that Cubria admitted to Edgewater, and to encourage Cubria to help increase the hospital's revenue. The advertising generated a large number of patients for Cubria's private office, which was a financial benefit to Cubria. In exchange for the advertising, Cubria maintained and/or increased the number of patients that he admitted to Edgewater, and he took other steps to help maintain and increase the hospital's revenue.

See Cubria's Plea Agreement, (Plea Agreement) at p.5.

The television advertising generated patients for Cubria's cardiology practice, and in turn, Cubria sent patients to Edgewater, including patients who contacted Cubria as a result of the advertising. Cubria performed unnecessary tests and procedures on patients who were admitted to the hospital from his clinic.

Roger Ehmen described the advertising as follows:

> Cubria was featured in certain ads. Cardiac patients that called in were transferred directly to Cubria's office. I had discussions with Cubria in which Cubria said the advertisements were also benefitting the hospital because any hospital admissions that Cubria generated from the program would be admitted to Edgewater.

The problem with the program was that two-third's of its budget paid for advertisement that exclusively benefitted Cubria. Advertisements relating to cardiology featured Cubria and new patients called in asking for Cubria. The program also included advertisements for other specialities, however, actors were used to represent these doctors and the names of the doctors were not displayed in the commercials.

According to Ehmen, the hospital tracked admissions that came from this advertising. The hospital identified these patients with the letters "SP" for the Spanish program. Edgewater's records show that in the year 2000, the hospital was paid more than $1.5 million for patients who were admitted under the code "Cubria SP". Thus, the television advertising generated a substantial amount of income. Cubria performed cardiac caths throughout the year 2000, and he admitted in his plea agreement that "at least half of the cardiac catheterizations that Cubria performed were medically unnecessary." See Cubria's Plea Agreement, at p. 3.

Naomi Lopez-Delvecchio described the advertising program as follows:

Edgewater paid for advertising for Cubria. The hospital did advertising on Channel 44. There were two parts to the advertising. One part was advertising for doctor referrals for the Spanish community. The ads were general and showed pictures of the hospital. When a patient called in, they were referred to a Spanish speaking doctor. The hospital did not have that many Spanish speaking physicians. About 20% of the calls from the advertising were in response to that general advertising.

The woman who answered the phone was a secretary. I trained her to make referrals after asking a few questions, based on a list of doctors. That did not apply to patients who had cardiac problems. All of the cardiac patients were referred to Cubria because he was the only cardiologist who spoke Spanish.

3

There was a separate ad that showed Cubria, and advertised Cubria's clinic and his services as a cardiologist. There was a separate telephone number for him that was maintained by the hospital. It was my understanding that the hospital paid for those ads and for the telephone line. A woman who was employed by the hospital answered that phone. She referred all of the calls concerning cardiac problems to Cubria. The patients wanted Cubria because they had seen him in the ad. Also he was the only Spanish speaking cardiologist in the program. Those ads, which were paid for by the hospital, generated patients for Cubria's clinic.

Roger Ehmen said that the attorneys said that the hospital was not supposed to pay for ads for private doctors. He said that the attorneys said that the hospital cannot advertise for a private doctor, and that was why the calls had to come in to a phone that was answered at the hospital, and then the calls were sent to Cubria. Ehmen said that we had to have a secretary answer the new lines, and have the calls go through the hospital, because they had been told by the attorneys that the hospital could not pay for ads for Cubria; that it was illegal to do that.

The defendant also admitted that he failed to tell patients that his decision to send them to Edgewater was influenced by kickbacks paid to him by Edgewater. Specifically, Cubria admitted that he "concealed, and caused others to conceal, from certain patients, material information concerning the payment of kickbacks in exchange for admissions, including the fact that those kickbacks were intended to, and did, influence the decisions of certain doctors, thereby depriving those patients of their doctors' honest services". Patients who responded to the television ads, who were admitted to Edgewater by Cubria, were victims in that they did not know about the kickbacks.

The free health screenings that were held at the CHA Housing Projects were also another method of mass marketing. According to

4

Roger Ehmen, the CHA program was required to generate approximately 500 admissions for the hospital per year. In the plea agreement, Cubria described the CHA program as follows:

> Edgewater obtained many patients from Chicago Housing Authority (CHA) buildings. Many of those patients were elderly and were Medicare beneficiaries. Many of the patients were sent from the south side of Chicago to Edgewater on the far north side of Chicago. Many of the CHA patients were admitted through Barnabas and Cubria. Many of those patients did not need to be hospitalized, and Cubria made false entries in the medical records in order to conceal the fact that those patients should not have been hospitalized. The individual who ran the CHA program, and Ehmen, each told Cubria that the CHA program had a quota concerning the number of patient admissions that the CHA program had to provide to Edgewater each month.

See Plea Agreement at p.4.

Moreover, Cubria acknowledged that "Dr. Rao had a quota concerning the number of patient admissions that he had to provide to Edgewater each month in order to keep his anesthesia contract. Cubria sometimes sent patients to the hospital and admitted them in a manner that helped Rao meet his quota." Rao had to admit approximately 25-30 patients a month. Rao paid other doctors and patient recruiters to send patients to the hospital. Patient recruiters used telemarketing to contact patients and convince them to go to the hospital. See Tape 3/3/98 (Patient recruiter Jaime Suarez stated that he used to telemarketing to obtain patients for hospital admission). This was also a form of mass marketing.

In sum, Cubria and his co-schemers used mass marketing in order to obtain patients, and in order to generate fees as part of

this scheme. Accordingly, two points for the mass marketing enhancement should be applied.

### Vulnerable Victims

The parties had agreed that the base offense level should be increased by 2 levels, pursuant to Guideline § 3A1.1(b)(1) because the defendant knew or should have known that a victim of the offense was a vulnerable victim. The parties also agreed that the base offense level should be increased by another 2 levels, pursuant to Guideline § 3A1.1(b)(2) because the defendant knew or should have known that the offense involved a large number of vulnerable victims. The defendant now seeks to reject that agreement, arguing that the patients in this case were not vulnerable.

Records from Edgewater Hospital show that between approximately 1995 and 2000, the defendant performed approximately 1500 cardiac caths, as well as other angiographic tests and procedures. Cubria admitted that at least half of the cardiac caths that he performed were medically unnecessary. That means that Cubria performed at least 750 unnecessary cardiac caths. Based on a random statistical sample that was performed, it is reasonable to conclude that hundreds of those patients were 60 years of age and older. Many of the patients were in their 70s and

80s. Many of the patients were ill. Some of the patients were demented or has schizophrenia. Some of the patients were handicapped including patients who were blind, or had amputations. These patients were unusually vulnerable due to their age, physical condition and/or mental condition. These were all factors that Cubria, as a doctor, had to consider in deciding whether to perform a cardiac test or procedure.

Set forth below are excerpts from a report prepared by Dr. Michael Lesch, a cardiologist[1]. Dr. Lesch reviewed approximately 160 patient files. Those files constituted a random statistical sample, drawn from Cubria's approximately 1500 cardiac cath patients. Dr. Lesch concluded that the majority of the cardiac caths and other angiograms performed were medically unnecessary. The government will submit Dr. Lesch's entire report as an exhibit if the Court wishes to see that report.

Excerpts from Dr. Lesch's report include the following information, which show that Cubria performed unnecessary tests and procedures on vulnerable patients:

### RUTH A.
72 year old nursing home transfer admitted for fever and dehydration. Patient described as non-verbal. Admitted for hydration and antibiotics on 2/9/00, and seen by Cubria in

---

[1] Dr. Lesch was the Chief of Cardiology at Northwestern Memorial Hospital in Chicago from 1976 to 1988, the Chairman of Medicine at the Henry Ford Hospital in Detroit Michigan from 1989 to 1998, and has been the Chairman of Medicine at St. Lukes-Roosevelt Hospital in New York City since 1998.

consult[2]. Cubria describes in his note, "non verbal, I could obtain no history" and on his physical exam of the extremities he notes, "she is a little bit contracted". His consult lists the following diagnoses: CAD by history, S/P Pacer, UTI, Organic Brain Syndrome and schedules patient for catheterization on 2/11/00.

**Comment:** A demented, senile woman, from a nursing home, with chronic flexion contractures is subjected to a cardiac cath, and another dye load at the time of the add on femoral angiogram, with absolutely no indication for either procedure being documented. Angiography is then repeated on two additional sessions wherein unnecessary femoral arteriograms are done and a second PTCA [angioplasty] is done. Angiography in a demented contracted patient with no active cardiac symptoms is malpractice, repugnant ethically, represents abuse of the elderly and raises questions of informed consent.

### ROBERT M.

A 75 year old male transferred from a nursing home, with a history of coronary disease, congestive heart failure, schizophrenia and cancer of the colon admitted on 10/20/95 for alleged chest pain.

**Comment:** This cath should not have been done based on the evidence in the chart and qualifies for the term "angiographic abuse" given the patients overall status (age, nursing home resident schizophrenia etc). Without some stress test evidence for ischemia or evidence for a persistent chest pain syndrome, this cath cannot be justified.

### MARIE C.

73 year old female with history of schizophrenia, depression and a remote MI admitted on 3/31/98 for toe pain. On 4/2, Cubria does a cardiac cath (for no apparent reason or justification). On 4/3, Cubria does a PTCA.

**Comment:** Absolutely no justification nor indication for the cardiac cath. This case exemplifies what by now is recognized as typical pattern of behavior by Cubria, i.e., over-reading of coronary angios to "justify" subsequent PTCA.

### CHARLES W.

71 year old patient with known schizophrenia who allegedly complained of chest pain. Admitted 3/27/96. Cubria does cath

---

[2] Patient names have been abbreviated.

on 3/28/96 and reports out a normal study. I agree it is normal.

**Comment:** Cath not indicated on basis of information in chart. This is abuse of a mentally impaired patient.

### MARGARITA C.

77 year old female transferred from a nursing home with right lower extremity vascular insufficiency. History of stroke, hemiparesis and dementia. Leg is painful on admission. No complaints of chest pain, shortness of breath or other cardiac symptoms. Cubria consulted and does bilateral femoral arteriogram on 11/3/99. On 11/9/99, Cubria does a multi vessel PTCA (LAD and Circumflex).

**Comment:** Both PTCAs were medically unnecessary. Cardiac cath not indicated in absence of any cardiac symptoms or at least some noninvasive data suggesting cardiac ischemia. Given the acute leg problem, hemiparesis, dementia, CVA, and age of the patient, the cardiac cath was probably specifically contraindicated. The cath report was erroneous and/or deliberately falsified to justify two unnecessary PTCAs. This is a heinous example of dehumanization of a demented, hemiparetic, elderly nursing home resident who is probably mentally incompetent as regards her ability to provide informed consent.

### CHARLES W.

71 year old patient of with known schizophrenia who allegedly complained of chest pain. Admitted 3/27/96. Cubria does cath on 3/28 and reports out a normal study. I agree it is normal.

**Comment:** Cath not indicated on basis of information in chart. This is abuse of a mentally impaired patient.

### AVEREA M.

A 71 year old demented patient transferred from a nursing home on 3/25/99 for alleged chest pain and dizziness. Admitted for the "ischemic protocol" and Cubria does a cardiac cath. He reports a greater than 75% lesion of the RCA and does a PTCA on the lesion. I read the lesion as less than 50% and therefore not critical.

**Comment:** This cath was not indicated on the basis of available information. Performance of medically unnecessary PTCA.

### EVERETT, S.

A 77 year old male admitted on 1/14/99 with complaints of dizziness and chest pain. The patient had no chest pain in the hospital and on 1/16/99 without any pre cath non invasive work up, Cubria does a cardiac cath. He describes a total RCA occlusion with L⇒R collaterals and a 25% circumflex lesion. Despite reporting the lesion as only 25%, he does a PTCA [angioplasty]. My review of the films indicates the lesion in question is 40-50% and thus still does not warrant PTCA. The chart is not completely clear but on 1/17/99, patient is on a respirator and by 1/18, needs circulatory support with IABP. He dies on 1/24.

**Comment:** There can be no question that this man died from a post PTCA infarct. Cubria unequivocally did a medically unnecessary PTCA since the lesion by his report was only 25% and by my estimation was 40-50%. Lesions less than 75% occlusive do not require PTCA. If my analysis of this case is correct, Cubria's unnecessary cath and a bogus PTCA caused this man's death[3].

### HENRY A.

70 year old male with a history of two months of chest pain. Patient is legally blind and has aplastic anemia. No noninvasive work up was done. He was placed on ischemic protocol and subjected to catheterization immediately. Catheterization is normal.

**Comment:** No indications or justification for the cath procedure because there was no work up which indicated the chest pain to be cardiac in nature.

### ELIZA C.

60 year old blind female with alleged history of two previous

---

[3] According to Dr. Fareed Khaja, a cardiologist and professor of Medicine at Wayne State University School of Medicine, Everett S. died as a result of complications caused by the angioplasty performed by defendant Cubria. Dr. Khaja prepared a report stating that, in his opinion, Everett S. did not need the angioplasty that ultimately lead to his death. ("Unwarranted and medically not indicated procedure of angioplasty lead to patient death"). In the plea agreement, Cubria admitted that "in approximately January 1999,...[Cubria] performed [an] unnecessary angioplast[y] on [a] patient[], which resulted in the death of [that] patient. Plea Agreement at p.3. Based on that patient's age and mental status, the patient who died in 1999 was a vulnerable victim.

myocardial infarctions admitted with chest pain 6/10/98. Cubria is consulted. EKG's are to my eyes normal, but Cubria reads them as poor R-wave progression consistent with anteroseptal MI. There is no written or typed consult by Cubria but he does a cath on 6/15. Cath is normal. I agree that coronaries are normal.

**Comment:** An erroneous reading of an EKG which appears to justify a cardiac cath. Failure to obtain a non invasive work up. Normal coronaries found. The fact that this patient is blind heightens the concept of abuse of a patient.

**Addenda:** From Dr. Cubria's office records it is apparent he did a cardiac cath (which no showed no structural disease) and an add on aortogram and renal arteriogram in 95. Knowledge of the 95 normal study makes Cubria's rush to the cath lab in 98 doubly reprehensible. Overall assessment: Cardiac cath was medically unnecessary.

## ALLIE H.
67 year old blind diabetic patient admitted from Cubria's office for evaluation of alleged angina and mitral regurgitation. Patient admitted on 8/4/00 and then without any noninvasive work up cathed by Cubria on 8/5/00.

**Comment:** Cardiac cath does not seem indicated in first place in this blind diabetic woman with no symptomatology of CHF and a questionable history of chest pain. No noninvasive workup to rule out either ischemic disease or to quantify the MR.

## STEPHANIE W.
A 75 year old female nursing home resident transferred for a painful ulcer on right foot. Has previously had a left below knee amputation and needs a chronic Foley urinary catheter. Has no cardiac complaints whatever. Patient admitted 10/23/97 and on 10/9, Cubria does a cardiac cath, an aortogram and a "bilateral" femoral arteriogram.

**Comment:** This patient may have justifiably needed a Right femoral arteriogram. However, to claim a bilateral femoral bipopliteal and bipedal arteriogram, when there has already been a left below knee amputation, is both medically inappropriate and an outright lie. Inappropriate since no symptoms or findings were present in the amputated leg and no surgery could have been contemplated. A "lie" because the pedal arch of the amputated leg was no longer present after the amputation of this leg. To do a cardiac cath and aortogram in an amputee with no cardiac symptoms and for no

11

obvious reason is to my mind criminally abusive of a crippled person. Lastly, to do a PTCA on a vessel when the muscle supplied by that artery is already dead and infarcted (i.e., the aneurysm is dead muscle) and to purposefully call an aneurysm "hypokinesis" is an obvious attempt to justify a non justifiable PTCA.

### CLARENCE R.

A 60 year old male admitted directly to the cath lab. There is no information in the chart which documents the need for or justification for cath. Of note is the fact that the man had a previous above knee amputation of the right leg. In the angiographic reports, Cubria claims to have done a full cardiac cath and right and left femoral, popliteal and bi-pedal angiograms. He reports the left circumflex vessel as showing a 50% lesion. I read the films as essentially normal with minor plaque. Also, he only imaged the RCA in one view.

**Comment**: Admission directly for angiographic studies without adequate documentation of the need for the angiographic study in the first place. Performance of add on angiographic studies. Fraudulent reporting of coronary lesions when none exist to justify the sign out diagnosis of coronary disease when no such disease exists. Blatant fraud and lying - one cannot do an angiogram of the popliteal and pedal arches in a leg that has been amputated above the knee since those areas of the leg have been cut off.

### IVORY M.

80 year old female admitted 5/1/99 with nausea and vomiting and shortness of breath for 24-36 hours. No chest pain. Patient had known end stage renal disease and was to be started on dialysis. For no documented or justified reason, Cubria does a cardiac cath, femoral arteriograms and an aortic arch study on 5/5.

**Comment**: There were no reasons to do any of these angiographic procedures. This is especially so, given the patient's age and renal status.

### VELMA B.

73 year old female admitted on 4/10 for a 2-3 week history of chest pain. Patient has chronic renal failure and is scheduled to be placed on dialysis shortly. No noninvasive cardiac work up documented. Doppler studies of legs indicate no significant abnormalities. Nonetheless, on 4/15 Cubria performs a cardiac cath and an aortogram and a bilateral femoral/popliteal/pedal arch study.

> **Comment:** The cardiac cath was not indicated in such an elderly renal failure patient without some noninvasive work up to indicate or suggest the presence of cardiac ischemia. The aortic and femoral angiograms were totally unnecessary given the results of the Doppler studies of the leg. Administration of angiographic dye to a patient with renal failure will only hasten the need for dialysis. To perform unnecessary angiographic procedures in such a patient thus has a component of double jeopardy for the patient - first the jeopardy from the invasive nature of the study itself and secondly the real and definite (as opposed to "potential or theoretic") danger of the nephrotoxicity of angiographic dye.

According to Dr. Lesch's review, more than 20 patients had two medically unnecessary cardiac caths, performed by defendant Cubria, during separate hospital admissions, ordinarily in two different years. At least 5 patients had three medically unnecessary cardiac caths performed by Cubria. Thus, the defendant's argument that the defendant did not "reload", or go back to the same victim on a second occasion, has no merit.

Moreover, the cardiac cath patients were not the only victims of the scheme. Other patients who were admitted to the hospital, who did not need hospital admission were also victims. As previously noted above, Cubria admitted in the plea agreement that

> Edgewater obtained many patients from Chicago Housing Authority (CHA) buildings. Many of those patients were elderly and were Medicare beneficiaries. Many of the patients were sent from the south side of Chicago to Edgewater on the far north side of Chicago. Many of the CHA patients were admitted through Barnabas and Cubria. Many of those patients did not need to be hospitalized, and Cubria made false entries in the medical records in order to conceal the fact that those patients should not have been hospitalized.

> See Plea Agreement at p.4.

The CHA patients, as well as other patients sent to the hospital by

13

Drs. Rao, Barnabas, and Kumar, were also vulnerable due to their age, physical condition, and mental status.

Accordingly, the Court should impose a total of 4 levels relating to vulnerable victims, based on 2 levels for vulnerable victims, and another 2 levels for a large number of vulnerable victims.

## Violation of a Judicial Order

The government has addressed this in its prior submissions. The Commentary to Section 2F1.1(b)(4)(C) gives an example of when this enhancement would apply. Application Note 6 states that "a defendant who business previously was enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, is subject to this enhancement." According to that Application Note, the enhancement would apply if the defendant had knowledge of the prohibition on selling the products, even though the defendant was not a party to the prior proceeding.

This case falls squarely within that example. In this case Cubria knew about the Settlement Agreement, and was aware that the business, Edgewater Hospital was enjoined from committing fraud, but Cubria nonetheless engaged in fraudulent conduct, and caused the Hospital to engage in fraudulent conduct. Thus, the enhancement should apply.

Defense counsel suggests that there is no substantial link

14

between the Settlement Agreement and the document signed by Cubria. That argument has no merit. The Settlement Agreement required that Edgewater engage in a compliance program, and that all doctors be required to participate in the compliance program. Refusal by the hospital would have breached the Settlement Agreement. Refusal by an individual doctor would have precluded the doctor from holding staff privileges at Edgewater. Cubria signed a Certificate as part of the compliance program, acknowledging that he understood his obligation to comply with all laws and regulations. Despite the warning to him that he must comply with the laws and regulations, he continued to commit fraud. This shows an aggravated criminal intent.

Defense counsel also suggests that the Settlement Agreement, and Cubria's certification that he would comply with the applicable laws and regulations should be viewed as being similar to a letter. In this instance, however, the Settlement Agreement was negotiated at length by the hospital and the Department of Justice, and the hospital paid more than $1 million to the government pursuant to the terms of the Settlement Agreement. The consequences of breaching the Agreement were serious, including the potential that the Agreement would be null and void, a civil law suit would be filed against the hospital by the Department of Justice, and the hospital could be suspended from the Medicare and Medicaid programs, which would likely result in the hospital's closing. The

Agreement, and the compliance program established in connection with that Agreement, were much more substantial than a single letter.

Accordingly, the Court should impose this two-level enhancement.

<h3 align="center">Downward Departure</h3>

The defendant seeks a downward departure based on extraordinary family circumstances, citing the fact that he was awarded custody of his 8 year old son, and he has a relationship with his two other children. This motion should be denied.

The defendant's son does not live with him at this time, even though he was given custody of his son. Def.'s Motion at 3. In addition, Cubria "now sees Blake...infrequently". Id. It has been more than 8 months since Blake has lived with the defendant. Id. Cubria's daughter is in college in California, and his son, Andrew Jr., has just graduated high school. Id. Neither of them live with Cubria. The defendant has failed to provide an adequate basis for a downward departure.

The framework for considering any departure motion is now well-established. See United States v. Koon, 518 U.S. 81, 95 (1996); see also United States v. Hirsch, No. 00-4272 (February 15, 2002 (7th Cir. 2002); United States v. Raimondi, 159 F.3d 1095 (7th Cir. 1998). In Raimondi, the Seventh Circuit summarized the analysis:

16

The Court [in <u>Koon</u>] began with the Sentencing Commission's instruction to sentencing courts "to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." The Court then considered the contrary situation: "When a court finds an atypical case, one to which a particular guideline linguistically applies but <u>where conduct significantly differs from the norm</u>, the court may consider whether a departure is warranted."

Before a district court is permitted to depart, held the Supreme Court, "certain aspects of the case must be found unusual enough for it to fall outside the heartland of case in the Guidelines." The Court noted that, except for the forbidden factors that must not be considered [forbidden factors include race, sex, national origin, creed, religion, socio-economic status, drug or alcohol dependence, economic duress or lack of guidance as a youth], the guidelines do not limit the kinds of factors...that could constitute grounds for departure <u>in an unusual case.</u> The factors are categorized as encouraged [encouraged factors include the defendant's role in the offense, criminal history, and dependence on criminal activity for a livelihood], discouraged [discouraged factors include a defendant's age, education, family and community ties, employment record, and mental or emotional conditions...These factors are not usually relevant to a departure decision], and unmentioned [unmentioned factors, by definition, do not receive any sort of explicit endorsement or prohibition in the Guidelines...The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent] bases of departure. <u>A district court assessing whether particular factors are "present in some unusual or exceptional way" that would justify a departure should consider whether the features of the case before it are unusual or atypical and could be the basis for a departure.</u>

<u>Id.</u> at 1101 (citations omitted)(emphasis added).

It is also well-established that the party seeking a departure from the Guidelines has the burden of proving that he or she meets the criteria for the departure. <u>See</u>, <u>e.g.</u>, <u>United States v. Ramirez</u>, 94 F.3d 1095, 1101 (7th Cir. 1996)("[w]hen the departure is downward, the defendant has the burden."). The defendant in

17

this case has failed to meet that burden.

A downward departure for exceptional family circumstances is a discouraged factor in the <u>Koon</u>-framework, such that a departure is allowed only in truly extraordinary or exceptional circumstances. Because defendant does not cite to any circumstance approaching this high standard, this motion for departure should be denied.

In <u>United States v. Canoy</u>, 38 F.3d 893 (7th Cir. 1994), the Seventh Circuit held that a district court may depart downward where a defendant's family circumstances are "truly exceptional and extraordinary," citing Guideline Section 5H1.6.[4] 38 F.3d at 903-909.

The Seventh Circuit remanded <u>Canoy</u> to the district court for it to determine whether Canoy's family circumstances were "truly exceptional and extraordinary," warranting a departure, or "usual and ordinary family circumstance," not warranting a departure. 38 F.3d at 908. In remanding, the Court referenced the "significant body of [related] law" in other Circuits and noted, with approval, that those courts "have generally indicated that the disintegration of existing family life or relationships is insufficient to warrant

---

[4] This Section provides, in full: "Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Family responsibilities that are complied with may be relevant to the determination of the amount of restitution or fine."

a departure, as that is to be expected when a family member engages in criminal activity that results in a period of incarceration." Id. at 907. The Seventh Circuit also summarized that other Circuit case law: "To warrant a departure, therefore, the courts have required a showing that the period of incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to family and parental relationships that would be present in the usual case." Id. Finally, the Court cited some decisions in which "exceptional circumstances" were found. Those examples included: circumstances where a defendant was the sole support for several family members, including, respectively, an institutionalized child, a disabled parent, or a mentally ill spouse; circumstances of "extreme mental anguish" resulting from a defendant involving a child in the criminal activity; circumstances where a defendant's spouse had psychiatric problems and her doctor opined that the spouse would deteriorate if separated from defendant; circumstances wherein a dependent had psychological and behavioral problems and a psychologist believed there would be a risk of regression and harm if defendant were incarcerated; and a circumstance of a "solid family and community ties and consistent efforts to lead a decent life in the difficult environment of an Indian reservation." Id. at 907-08 (citations omitted).

Consistent with the holding of Canoy, subsequent cases have emphasized the family circumstances must be extraordinary. For

example, in <u>United States v. Wright</u>, 218 F.3d 812 (7th Cir. 2000), the Seventh Circuit reversed an extraordinary family circumstances-departure which was predicated on a clinical psychologist's report concerning the "anxious and depressed" reaction of a seven-year old to his mother's impending incarceration. In so ruling, the Court noted that it had denied the departure in circumstances more compelling than the defendant in <u>Wright</u> and required "[that] the record establishes not only that the harm 'would be greater than the harm to a normal child' but also that care from other sources would be unable to alleviate that harm." <u>Id.</u> at 815-816 (citations omitted.). The Court also noted that reducing a long sentence with a few years off is "worthless to children and costly to the program of proportionate punishment under the Guidelines" and concluded that "a downward departure for extraordinary family circumstances cannot be justified when, even after reduction, the sentence is so long that release will come too late to promote the child's welfare." <u>Id.</u>  See <u>also</u> <u>United</u> <u>States v. Stefonek</u>, 179 F.3d 1030, 1038 (7th Cir. 1999)(in remanding for re-sentencing, Seventh Circuit notes the need to develop additional evidence regarding family circumstances: "we do know that the child's father is available to assist in taking care of child [while defendant-mother] is in prison, and for all we know, or the record shows, professionals are available to deal with children's learning problems as effectively-probably more effectively-than mothers who

20

are not themselves educational psychologists."); <u>United States v.</u>
<u>Carter</u>, 122 F.3d 469, 471-475 (7th Cir. 1997)(district court denies
downward departure motion based on, among other grounds, family and
community ties, and Seventh Circuit affirms, noting, in part, that
defendant's three children have a mother and grandparents who will
help look after them.)

Applying this case law, it is clear that the defendant has
failed to make the requisite showing for a downward departure.
Here, the defendant's son Blake is being cared for by the child's
mother. The circumstance defendant identifies as "extraordinary,"
the fact that he will be absent and his child will miss him, are
the "typical" negative impacts on a family that occur when an
individual is incarcerated. But the <u>Canoy</u> court makes clear, they
are "insufficient to warrant a departure, as that [disintegration]
is to be expected when a family member engages in criminal activity
that results in a period of incarceration." <u>Canoy</u>, 38 F.2d at 907.
Accordingly, defendant's motion for a downward departure on the
ground of exceptional family circumstances should be denied.

## CONCLUSION

Based on the foregoing, the government respectfully requests that the Court reject the defendant's arguments concerning the mass marketing and vulnerable victim enhancements, and deny the defendant's motion for a downward departure.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   *Jacquel St*
        JACQUELINE STERN
        KAARINA SALOVAARA
        Assistant U.S. Attorneys
        219 South Dearborn, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300